(No. 89985.—

MARSHA NORSKOG, Indiv. and as Adm'r of the Estate of Hillary Norskog, Appellant, v. ROGER PFIEL *et al.*, Appellees.

*Opinion filed July 26, 2001.*

HARRISON, C.J., specially concurring.

Michael H. King, Donald C. Pasulka and Peter N. Witty, of Ross & Hardies, of Chicago, for appellant.

Michael C. Borders and Daniel M. Noland, of Rooks, Pitts & Poust, of Chicago, for appellees Roger Pfiel & Gayle Pfiel.

Raymond D. Pijon and Edward T. Graney, of Chicago, for appellee Steven Pfiel.

Mark Heyrman, of Chicago, and Michelle McGuinness, law student, for *amicus curiae* Mental Health Association in Illinois.

Barry C. Taylor and Karen I. Ward, of Chicago, for *amici curiae* Bazelon Center for Mental Health Law *et al.*

JUSTICE McMORROW delivered the opinion of the court:

On April 30, 1999, the circuit court of Cook County issued contempt citations against Roger and Gayle Pfiel (the Pfiels) and their son, Steven Pfiel (Steven) (collectively, the defendants), for refusing to comply with discovery orders directing them to identify mental health services providers seen by Steven and to disclose information regarding Steven's diagnosis and treatment. Defendants appealed and the appellate court reversed the orders of contempt (314 Ill. App. 3d 877), finding that the trial court erred when it compelled the disclosure of this information, which was privileged pursuant to the Mental Health and Developmental Disabilities Confiden-

tiality Act (the Mental Health Act) (740 ILCS 110/1 *et seq.* (West 1998)). Plaintiff, Marsha Norskog, petitioned this court for leave to appeal and the petition was granted. 177 Ill. 2d R. 315(a).

We allowed *amicus* briefs in support of the defendants to be filed by the Mental Health Association in Illinois and, collectively, by Bazelon Center for Mental Health Law, Equip for Equality, Inc., the Illinois Psychological Association, the National Alliance for the Mentally Ill— Illinois Chapter, the National Depressive and Manic Depressive Association, and the National Mental Health Association.

For reasons that follow, we now affirm the judgment of the appellate court.

## BACKGROUND

On July 14, 1993, plaintiff's 13-year-old daughter, Hillary Norskog, was stabbed to death. Seventeen-year-old Steven, who had been dating Hillary, was charged with her murder. Initially, Steven pleaded not guilty to the criminal charges and gave notice that he would assert an insanity defense. The trial court appointed a psychiatrist, Dr. Markos, to examine Steven to determine his fitness to stand trial.

On March 18, 1995, while Steven was free on bond, he killed his brother and assaulted his sister. Thereafter, Steven entered into a negotiated plea agreement. Steven pleaded guilty to the murders of Hillary and his brother and was sentenced to life imprisonment without the possibility of parole.

In July 1995, plaintiff, individually and as the administrator of Hillary's estate, filed a civil complaint against the defendants. The complaint was amended on June 26, 1996, to allege 12 counts. Some counts have been dismissed, but the remaining counts include wrongful-death and survival actions against Steven alleg-

ing intentional assault and battery of Hillary,[1] wrongful-death and survival actions against the Pfiels for negligent supervision and negligent entrustment, an action against Steven for reckless infliction of emotional distress with respect to plaintiff, and an action against the Pfiels brought under the Family Expenses Act. See 750 ILCS 65/15 (West 2000).

In the negligent supervision counts, plaintiff alleges that the Pfiels knew or should have known of their minor son's "antisocial, aggressive, hostile, and criminal behavior," but failed to properly supervise and control him. The negligent entrustment counts are premised on allegations that the Pfiels negligently entrusted Steven with dangerous instrumentalities, namely, a hunting knife with a $5^{1}/_{4}$-inch blade, which Steven used to kill Hillary, and an automobile owned by Gayle Pfiel, which Steven drove on the night of Hillary's murder.

Plaintiff's amended complaint contained several factual allegations which made reference to Steven being the recipient of mental health services.[2] Both Steven and the Pfiels objected and moved to strike these allegations. Defendants contended that all mental health records and communications with mental health providers, including information which identified Steven as the recipient of mental health services, were privileged under the Mental Health Act.

Over defendants' claim of privilege, plaintiff persisted

[1]The trial court has ruled that Steven may not disavow liability on the assault and battery claims against him. Only the question of damages remains on these claims.

[2]Among the numerous factual allegations contained in the amended complaint, plaintiff claimed "on information and belief" that Steven began receiving "professional psychiatric treatment" at the age of nine for a "chemical imbalance." Plaintiff seeks to verify this and other allegations through discovery and to uncover additional evidence which might advance her claims against the Pfiels.

in her efforts to obtain Steven's mental health information by subpoenaing Steven's school records, submitting interrogatories to the defendants, and by subpoenaing the defendants to appear for deposition and directing them to produce documents and records which would reveal when and for what purpose Steven may have received mental health or psychiatric treatment prior to July 1993; whether a diagnosis was made; and whether a treatment plan was suggested to the Pfiels. Plaintiff also subpoenaed Dr. Markos, the court-ordered psychiatrist who examined Steven to determine his fitness to stand trial on the criminal charges. The subpoena instructed Dr. Markos to provide copies of all records received and used by him in conjunction with his court-ordered fitness examinations of Steven.

In support of her claim to this information, plaintiff argued that Steven waived the confidentiality privilege to all of his mental health records by raising the insanity defense at his criminal trial, by disclosing mental health information and records to Dr. Markos at his fitness examinations, and by providing mental health information to school officials, his probation officer, and others. Plaintiff claimed that Steven's mental health treatment was a matter of public record, having been publicly disclosed in an article in the Chicago Magazine. A copy of the article was attached to papers plaintiff filed in the circuit court.

In the alternative, plaintiff claimed that, pursuant to this court's opinion in *D.C. v. S.A.*, 178 Ill. 2d 551 (1997), even if the confidentiality privilege had not been waived, fundamental fairness demanded that the mental health information be made available in the pending civil proceeding.

Defendants objected to the release of Steven's school records, arguing that the information was privileged under the Illinois School Students Records Act (105 ILCS

10/1 *et seq.* (West 2000)), as well as the Mental Health Act. Defendants also denied that the Mental Health Act confidentiality privilege had been waived and moved to quash all subpoenas and refused to answer any interrogatories which would reveal whether Steven was the recipient of mental health services.

In resolving these matters, the trial court ruled that Steven's mental health information was privileged under the Mental Health Act. The trial court reviewed *in camera* Steven's school records and deleted all material which would be confidential under the Mental Health Act. However, before deciding whether Steven waived the confidentiality privilege when he was examined by Dr. Markos, the trial court allowed plaintiff to depose Dr. Markos concerning the nature and scope of confidentiality admonitions given to Steven during his fitness examinations. Based on Dr. Markos' deposition testimony, the trial court, in an order dated March 16, 1999, ruled as follows:

"That Steven Pfiel's motion to quash the subpoena for deposition of Dr. Markos is granted. For reasons stated in open court, including findings that Pfiel has not waived his privilege under the Mental Health and Development [*sic*] Disabilities Confidentiality Act and that admonitions given to him by Dr. Markos were insufficient to constitute waiver of confidentiality or privilege, the plaintiff may not depose Dr. Markos or obtain his records pertaining to Pfiel's fitness-for-trial examinations.

\* \* \*

\*\*\* [T]his court finds per *D.C. v. S.A.,* 178 Ill. 2d 551 (1997), Roger Pfiel and Gayle Pfiel should produce the identities of any mental health provider seen by Steven Pfiel and the dates on which each provider saw him. Plaintiff may depose Roger Pfiel and Gayle Pfiel as to any communications made to them by a mental health provider but such questions shall be limited to Steven's diagnosis and any recommendation or admonition given to them by a mental health provider as to what they should or should

not do concerning Steven's mental health. Plaintiff may depose any mental health provider limited to the above areas. Pursuant to 740 ILCS 110/10, this court shall conduct an *in camera* inspection of testimony or other evidence concerning the discovery information permitted above to determine that it is relevant, probative, not unduly prejudicial or inflammatory, and otherwise admissible."

On March 17, 1999, a second order was entered, directing all parties to answer Rule 213(f) interrogatories; granting plaintiff permission to depose Steven; ordering the Pfiels to disclose Steven's mental health providers by March 31, 1999; and allowing plaintiff to subpoena Steven's mental health records from providers identified, with such records being returnable to the court for examination.

In a motion dated April 14, 1999, the Pfiels "respectfully decline[d] to comply with the courts [*sic*] orders of March 16 and March 17, 1999 as they pertain to identifying any mental health therapists who provided services to Steven Pfiel." The Pfiels requested that the trial court "issue a contempt citation against them for the purpose of seeking appellate review of the legal issue about which there is a good faith dispute." Steven also sought a contempt citation after giving notice that he would refuse to comply with these and other orders directing him to identify mental health providers who had treated him prior to July 14, 1993.

On April 29, 1999, plaintiff filed a motion, asking the trial court to certify two questions for appellate review pursuant to Supreme Court Rule 308(a):

(1) "Does a defendant's raising and pursuing an insanity defense in a criminal case constitute a waiver of the defendant's mental health privilege arising under the Mental Health and Development [*sic*] Disabilities Confidentiality Act in a subsequent civil case?"

(2) "Does a defendant's disclosure of his mental health treatment and/or condition in a criminal case after a court-appointed psychiatrist informs the defendant that informa-

tion provided to the court-appointed psychiatrist is not confidential, result in a waiver of any mental health privilege in a subsequent civil case?"

The trial court refused to certify these questions and, instead, entered an order on April 30, 1999, holding defendants in contempt of court for refusing to comply with the court's discovery orders. A fine of $25 was imposed on each defendant. The court noted in the order that defendants were acting in good faith, for the purpose of seeking appellate review.

On May 14, 1999, defendants appealed their contempt citations in the appellate court pursuant to Supreme Court Rule 304(b)(5). The appellate court, when ruling on the appeal, refused to consider whether Steven "placed his mental health at issue under the terms of section 10(a)(1) or otherwise waived his privilege." These matters, the appellate court held, were "not at issue in this appeal." Rather, the appellate court considered only whether Steven's mental health information, though confidential and privileged under the Act, was discoverable pursuant to *D.C. v. S.A.*, 178 Ill. 2d 551 (1997).

Finding that the *D.C.* exception did not apply in this case, the appellate court ruled that defendants could not be compelled to disclose Steven's mental health information. For that reason, the appellate court reversed the orders holding defendants in contempt of court for refusing to comply with the trial court's orders.

Plaintiff petitioned this court for leave to appeal and the petition was granted. 177 Ill. 2d R. 315(a).

## ANALYSIS

### Scope and Standard of Review

As a preliminary matter, we address defendants' contention that this court's jurisdiction extends only to reviewing, as the appellate court did, the question of whether the judicially constructed fundamental fairness exception to the Mental Health Act confidentiality

privilege, announced in *D.C. v. S.A.*, applies to this case. We find no such limitation on this court's jurisdiction.

As noted above, an interlocutory appeal was initiated in the appellate court, pursuant to Supreme Court Rule 304(b)(5) (155 Ill. 2d R. 304(b)(5)), after defendants refused to comply with the trial court's discovery orders, were held in contempt, and were sanctioned. Because discovery orders are not final orders, they are not ordinarily appealable. *People ex rel. Scott v. Silverstein*, 87 Ill. 2d 167, 171 (1981); *Lewis v. Family Planning Management, Inc.*, 306 Ill. App. 3d 918, 921 (1999). However, it is well settled that the correctness of a discovery order may be tested through contempt proceedings. *Eskandani v. Phillips*, 61 Ill. 2d 183, 194 (1975). When an individual appeals contempt sanctions imposed for violating, or threatening to violate, a pretrial discovery order, the discovery order is subject to review. See *Almgren v. Rush-Presbyterian-St. Luke's Medical Center*, 162 Ill. 2d 205, 216 (1994). Review of the contempt finding necessarily requires review of the order upon which it is based. *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 189 (1991).

In the case at bar, although the trial court found that the statutory confidentiality privilege applied and had not been waived, it then allowed discovery based on its finding that an exception to the confidentiality privilege existed. It would be incongruous for us to review the trial court's application of the exception without first considering whether the trial court was correct in its initial application of statutory privilege. It is the order of discovery, not merely the grounds upon which it was based, that is subject to review. This is especially so since a contrary determination on the issues of waiver would be equally determinative to the question of whether discovery was available. As a general rule, courts of

review may sustain orders on any grounds which are called for by the record, regardless of the grounds relied on when the order was entered. *Gunthorp v. Golan*, 184 Ill. 2d 432, 438 (1998); *Messenger v. Edgar*, 157 Ill. 2d 162 (1993); *Bell v. Louisville & Nashville R.R. Co.*, 106 Ill. 2d 135 (1985). Consequently, in the appeal before this court, before deciding whether, pursuant to *D.C. v. S.A.*, fundamental fairness requires the disclosure of information which is otherwise privileged, we will consider whether the information is, in fact, privileged under the Mental Health Act or whether, as plaintiff claims, the privilege has been waived.

Our jurisdiction over the waiver issues is unaffected by the trial court's denial of plaintiff's request to have these issues certified for review pursuant to Supreme Court Rule 308. Granting plaintiff appeal by certification would have been improper under the circumstances. See *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382 (1983) (one who has obtained all that has been asked for in the trial court cannot appeal from the judgment, appeal should not be afforded to successful parties who may not agree with the reasons, conclusion or findings below). Furthermore, certification of the issues was unnecessary since, as we have already shown, defendant's appeal of the contempt order called into question the correctness of the discovery order and allowed review of all the trial court's rulings on the application of the Mental Health Act's confidentiality privilege.

Although a trial court's discovery order is ordinarily reviewed for a manifest abuse of discretion (*Maxwell v. Hobart Corp.*, 216 Ill. App. 3d 108, 110 (1991)), the proper standard of review depends on the question that was answered in the trial court (*Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396 (1998)). If the facts are uncontroverted and the issue is the trial court's application of the law to the facts, a court of review may

determine the correctness of the ruling independently of the trial court's judgment. *In re Marriage of Bonneau*, 294 Ill. App. 3d 720, 723-24 (1998).

In this appeal, we are deciding whether disclosure of mental health information is prohibited by a statutory discovery privilege and whether any exception to the privilege applies. These are matters of law subject to *de novo* review. *D.C. v. S.A.*, 178 Ill. 2d 551, 559 (1997).

The Mental Health Act Confidentiality Privilege

The Mental Health and Developmental Disabilities Confidentiality Act provides that "any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient" and "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient," including "information which indicates that a person is a recipient," "shall be confidential and shall not be disclosed except as provided in this Act." 740 ILCS 110/2, 3(a) (West 2000). Subsequent sections of the Act identify the persons entitled to inspect and copy a recipient's mental health record and delineate when and how disclosure to other persons or agencies may be accomplished.

"The Confidentiality Act is carefully drawn to maintain the confidentiality of mental health records except in the specific circumstances explicitly enumerated." *Sassali v. Rockford Memorial Hospital*, 296 Ill. App. 3d 80, 84-85 (1998). In each instance where disclosure is allowed under the Act, the legislature has been careful to restrict disclosure to that which is necessary to accomplish a particular purpose. Exceptions to the Act are narrowly crafted. *Pritchard v. SwedishAmerican Hospital*, 191 Ill. App. 3d 388, 402 (1989). When viewed as a whole, the Act constitutes a "strong state-

ment" by the General Assembly about the importance of keeping mental health records confidential. *Mandziara v. Canulli*, 299 Ill. App. 3d 593, 599 (1998). That a high value is placed on privacy is evidenced by the fact that the privilege afforded a recipient of mental health treatment continues even after the recipient's death. See 740 ILCS 110/5(e) (West 2000).

The statutory scheme regulating the disclosure of mental health information is appropriately rigorous. As the United States Supreme Court noted:

"Effective psychotherapy *** depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." *Jaffee v. Redmond*, 518 U.S. 1, 10, 135 L. Ed. 2d 337, 345, 116 S. Ct. 1923, 1928 (1996).

All 50 states, the District of Columbia and the federal courts recognize a psychiatrist-patient privilege, either by statute or common law. *Jaffee*, 518 U.S. at 12, 135 L. Ed. 2d at 346, 116 S. Ct. at 1929. Clearly, this reflects an understanding that people will increasingly avail themselves of needed treatment if they are confident that their privacy will be protected. It is in the public interest, then, that we zealously guard against erosion of the confidentiality privilege. See *Jaffee*, 518 U.S. at 11, 135 L. Ed. 2d at 345-46, 116 S. Ct. at 1929 ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance"); *Doe v. McKay*, 183 Ill. 2d 272 (1998). Consequently, anyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act.

In the present case, it is undisputed that records and communications concerning mental health treatment Steven may have received are subject to the privilege provided by the Mental Health Act and that Steven has not consented to its release. Furthermore, since the term "communications" includes "any communication made by a recipient *or other person* to a therapist \*\*\* in connection with providing mental health or developmental disability services to a recipient," Steven's lack of consent also prevents his parents from disclosing their conversations with therapists in relation to Steven's mental health treatment.[3]

Plaintiff, however, contends that she is entitled to discovery of this information because Steven has waived the privilege in the present proceedings by: (1) raising an insanity defense in his criminal trial, (2) revealing mental health information to Dr. Markos at his fitness examinations, and (3) providing mental health information to school officials, a probation officer, and others. We shall consider each claim of waiver individually.

*Raising an Insanity Defense in the Criminal Case*

Although there is a general prohibition against nonconsensual disclosure of mental health information, exceptions are recognized by the Act. One such exception is found in section 10(a)(1) of the Act, which provides in pertinent part, that "[r]ecords and communications may

---

[3]Although argument in this case focuses, for the most part, on Steven's privilege to maintain the confidentiality of his mental health records and communications, we note that the parents have an independent right to maintain the confidentiality of conversations they may have had with mental health professionals with regard to their minor son. See *In re Marriage of Semmler*, 90 Ill. App. 3d 649 (1980) (mother was a "recipient" within the meaning of the Mental Health Act when she consulted with her minor child's therapist for parenting advice and minor child's consent to disclosure did not supplant the mother's independent privilege to prevent disclosure of conversations with the therapist).

be disclosed in a civil, criminal or administrative proceeding in which the recipient introduces his mental condition or any aspect of his services received for such condition as an element of his claim or defense ***." 740 ILCS 110/10(a)(1) (West 2000).

In the case at bar, neither Steven nor his parents have introduced Steven's mental health care or treatment as an element of their defense to the civil claims filed against them. Plaintiff does not dispute this. Nevertheless, plaintiff claims that Steven forfeited his right to the confidentiality privilege in these proceedings by raising an insanity defense in his criminal case. As sole support for her position, plaintiff relies on this court's decision in *Novak v. Rantham*, 106 Ill. 2d 478 (1985).

In *Novak*, Robert Lee Endicott shot and killed Beverly Novak after he was released from Zeller Mental Health Center, where he had been involuntarily committed. At Endicott's homicide trial, Endicott asserted the defense of insanity and presented the testimony of four psychiatrists, including Rantham, who had treated Endicott at Zeller. Endicott also introduced at his criminal trial all of his medical records from Zeller. Endicott received a "not guilty by reason of insanity" verdict. Subsequently, Beverly's father, David Novak, brought a wrongful-death action against Rantham and Girmscheid, a psychologist who treated Endicott at Zeller, claiming that they had been negligent for approving Endicott's discharge.

Before requiring Rantham and Girmscheid to submit themselves for depositions, the circuit court certified a question for review pursuant to Supreme Court Rule 308, asking whether Rantham and Girmscheid were barred from testifying by the Mental Health and Developmental Disabilities Act. In answering the certified question, we recognized that, pursuant to section 10(a)(1) of the Act, Endicott waived the privilege of keeping his

mental health records confidential at his criminal trial by raising the insanity defense. "Indeed, when a defendant raises an insanity defense and calls his own medical expert as a witness to establish the defense, he cannot thereafter assert the privilege to prevent the State, at the same trial, from calling other medical experts who treated him for the same condition." *Novak*, 106 Ill. 2d at 483. It had long been recognized that a defendant, by raising the insanity defense, opened the door to discovery of his mental health records. See *People v. Newbury*, 53 Ill. 2d 228, 234 (1972).

However, in *Novak*, we further determined that, once the confidentiality privilege had been waived, it could not be reclaimed in a subsequent proceeding. We reasoned that "the testimony of Rantham in favor of Endicott's defense at his trial was a public disclosure by Endicott of information protected by the Act and, as Wigmore puts it, took away its confidentiality." See 8 J. Wigmore, Evidence § 2389(4), at 860-61 (McNaughton rev. ed. 1961); see also *People v. Leppert*, 105 Ill. App. 3d 514 (1982). Consequently, we held that there was no legal basis for barring Rantham and Girmscheid from testifying regarding Endicott's mental health treatment in the wrongful-death action against them.

Plaintiff's reliance on *Novak* in the present case, however, is misplaced. The facts of *Novak* are inapposite and readily distinguishable. Insanity is raised as an affirmative defense when a defendant admits the offense charged but claims that, at the time of the offense, he was insane and therefore lacked substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. *People v. Kashney*, 111 Ill. 2d 454, 464-65 (1986). In the case at bar, the defense of insanity was never raised because Steven never went to trial in his criminal case. Steven entered a plea of guilty. A plea of guilty waives all

nonjurisdictional defenses or defects. *People v. Burton*, 184 Ill. 2d 1 (1998). By pleading guilty, then, the question of sanity was no longer an issue. Furthermore, no psychiatrist or mental health therapist ever made a public disclosure of Steven's mental health records or testified in open court regarding mental health treatment Steven had received. Under these circumstances it cannot be said that Steven waived the confidentiality privilege by raising an insanity defense in a prior criminal trial. The rationale employed in *Novak* for finding that the confidentiality privilege had been waived is not applicable under the facts of this case.

### Waiver of Confidentiality at Fitness Examination

Plaintiff next contends, pursuant to section 10(a)(4) of the Mental Health Act, that Steven's mental health information is admissible in the pending civil litigation because Steven participated in a court-ordered fitness examination in his criminal case and, after being admonished that the information he revealed would not be kept confidential, provided the examining psychiatrist with information concerning his prior mental health treatment.

Section 10(a)(4) of the Mental Health Act provides:

"Records and communications made to or by a therapist in the course of examination ordered by a court for good cause shown may, if otherwise relevant and admissible, be disclosed in a civil, criminal, or administrative proceeding in which the recipient is a party or in appropriate pretrial proceedings, provided such court has found that the recipient has been as adequately and as effectively as possible informed before submitting to such examination that such records and communications would not be considered confidential or privileged. Such records and communications shall be admissible only as to issues involving the recipient's physical or mental condition and only to the extent that these are germane to such proceedings." 740 ILCS 110/10(a)(4) (West 2000).

As earlier noted, this claim was raised in the trial

court and, before deciding whether defendant waived the privilege, the trial court allowed plaintiff to depose Dr. Markos concerning the admonishments he gave Steven before his fitness examination. At the deposition, Dr. Markos testified that he followed standard protocol. Dr. Markos testified,

"I do not believe that the instruction that I gave Mr. Steven Pfiel was in anyway different or was in variance from the instruction or admonishment that I have provided to the other defendants in the past. *** What I informed Mr. Pfiel prior to the clinical examination was that any information he provided me with may be or could be contained in a report or reports that I submitted to the court, including the opinions."

When asked if he mentioned anything about disclosure of the information in any civil proceedings, Dr. Markos answered, "No, I did not."

Based on Dr. Markos' testimony, there is no basis for allowing disclosure of Steven's privileged mental health records and communications pursuant to the exception provided in section 10(a)(4) of the Mental Health Act. When Dr. Markos admonished Steven regarding confidentiality, it was within the context of a fitness examination. There are strict rules governing the use of information revealed to an examiner in a fitness exam.

Section 104—14(a) of the Code of Criminal Procedure of 1963 provides in relevant part:

"Statements made by the defendant and information gathered in the course of any examination or treatment ordered under Section 104—13, 104—17 or 104—20 shall not be admissible against the defendant unless he raises the defense of insanity or the defense of drugged or intoxicated condition, in which case they shall be admissible only on the issue of whether he was insane, drugged, or intoxicated." 725 ILCS 5/104—14(a) (West 2000).

In subsection (b) of section 104—14, it provides that any further use of statements made in the course of a fitness examination, beyond what is allowed in subsection (a), must be with defendant's informed written consent.

Based on this statutory scheme, it is reasonable to conclude that by participating in the court-ordered fitness examinations, Steven agreed to waive his confidentiality privilege only to the extent provided by the strict procedural rules contained in the Criminal Code.[4] Since admonishments given to Steven by Dr. Markos did not go beyond the typical cautionary warnings, we must also conclude that Steven did not waive his confidentiality privilege for purposes other than that which is provided for by the rules of criminal procedure. See *People v. Gemeny*, 313 Ill. App. 3d 902, 909 (2000) ("This legislative care in limiting permissible disclosure strongly suggests that we may not assume that eliminating confidentiality in one judicial setting means eliminating it in all settings"). Steven was not notified "as adequately and as effectively as possible *** that such records and communications would not be considered confidential or privileged" (740 ILCS 110/10(a)(4) (West 2000)). Consequently, the admonishments given to Steven at his fitness examinations were insufficient to allow disclosure of Steven's mental health information in the civil proceedings.

### Release of Information to Third Parties

In plaintiff's third and final argument concerning waiver, plaintiff contends that the confidentiality privi-

---

[4]We do not decide here whether written consent, required by section 104—14(b) (725 ILCS 5/104—14(b) (West 2000)), is necessary for the release of Steven's privileged information in civil proceedings pursuant to section 10(a)(4) of the Act. Without expressing any opinion on the case, we note that in *People v. Sutton*, 316 Ill. App. 3d 874 (2000), the appellate court recently held that the admissibility provision of section 104—14(a) of the Code of Criminal Procedure took precedence over a homicide exception to the physician-patient privilege under section 8—802 of the Code of Civil Procedure, stating that, to the extent the two statutes were in conflict, the more specific and detailed fitness scheme of section 104—14(a) was controlling.

lege should be considered waived because Steven voluntarily shared information with school officials and court personnel, such as Steven's probation officer, and because there was a public disclosure concerning Steven's mental health treatment in an article in a local publication, Chicago Magazine. Plaintiff does not provide any authority, either statutory or case law, for a finding of waiver under these circumstances. Furthermore, one need only look to the Mental Health Act to find that plaintiff's position is untenable.

The Mental Health Act provides for the consensual disclosure of information by a recipient. 740 ILCS 110/5 (West 2000). Section 5 of the Act makes it clear that a recipient may consent to disclosure of information for a limited purpose and that any agency or person who obtains confidential and privileged information may not redisclose the information without the recipient's specific consent.

Assuming that, as plaintiff contends, defendants have shared Steven's mental health treatment records with school officials and a probation officer, we draw from this fact no conclusion that Steven intended to waive his confidentiality privilege. Any confidential information which may have been shared was released for a limited purpose and did not constitute a general waiver of the confidentiality privilege.

Nor do we find that there has been a public disclosure of Steven's mental health record merely because an issue of Chicago Magazine contained an article in which a single, brief reference was made to Steven having been treated for a "chemical imbalance." By all indications, this article was not authorized by either Steven or the Pfiels. Consequently, any information which has come into the public domain through this article was without Steven's consent and cannot be considered as evidence that he waived the confidentiality privilege.

Furthermore, even if we ignored the unauthorized nature of the article, we would be constrained to find that, to the extent the article constitutes a public disclosure, waiver of the confidentiality privilege would be limited to the information contained in the public disclosure. The magazine article cannot provide the basis for allowing the type of full-scale disclosure of Steven's mental health records which plaintiff seeks.

In sum, the Mental Health Act places strict limits on the circumstances under which disclosure of confidential information may be allowed, as well as the amount of confidential information that may be released. In most instances, when a party seeks the admission of mental health records and communications in legal or administrative proceedings, section 10(a)(1) of the Act will provide the framework for determining when confidential information may be disclosed. Accordingly, an initial hurdle will be showing that the recipient's mental condition was introduced by the recipient. If this hurdle cannot be met, the information may not be admitted, regardless of whether the opposing party's claim or position would be advanced or facilitated by the disclosure of the information. Waiver of the privilege is recognized in very limited circumstances. In the present case, the circumstances do not support a finding that the mental health confidentiality privilege has been waived.

### The Fundamental Fairness Exception

The final issue, and the crux of this appeal, is whether Steven's mental health records and communications, which are decidedly confidential and privileged under the Mental Health Act, should, nevertheless, be disclosed in the pending civil proceedings based on considerations of fundamental fairness. Authority for claiming the existence of a fundamental fairness exception to the Mental Health Act confidentiality privilege is grounded on this court's decision in *D.C. v. S.A.*, 178 Ill. 2d 551 (1997).

Consequently, we look to our opinion in *D.C.* and its foundational principles. We begin with a review of the facts and procedural history of the case.

The plaintiff in *D.C.* filed a negligence action against defendants seeking recovery for injuries he allegedly suffered when he attempted to walk across a highway and was struck by a car driven by S.A. Defendants answered the complaint, raised the affirmative defense of plaintiff's contributory negligence, and filed a counterclaim alleging plaintiff's negligence was the proximate cause of damages to S.A.'s vehicle.

In the course of discovery, defendants issued subpoenas for deposition to the Edwards Hospital, where plaintiff was treated after the accident, and to Dr. Georgeson, plaintiff's treating physician, directing them to produce plaintiff's "medical, psychiatric and/or psychological records for copying." Plaintiff sought a protective order and the trial court ordered that production be limited to plaintiff's medical records, which were discoverable on the issue of damages. The medical records which were produced showed that upon plaintiff's release from Edwards Hospital, he was referred to Linden Oaks Hospital, the psychiatric unit of Edwards Hospital. Additionally, plaintiff's treating physician prepared a medical treatment summary in which it was noted that the referral for psychiatric treatment was made based on indications by plaintiff that he might have been attempting suicide at the time of the accident. Defendants then moved to compel production of plaintiff's psychiatric and psychological records.

Plaintiff invoked the privilege afforded by the Mental Health Act, but the trial court ruled that plaintiff had introduced his mental condition into the proceedings. The trial court ordered that all of plaintiff's medical and psychiatric records be produced for *in camera* inspection. After reviewing the records, the trial court ruled that

three pages of records from Edwards Hospital and three specific items of information contained in the records from Linden Oaks were relevant and admissible pursuant to the factors set forth in section 10(a)(1) of the Mental Health Act. Before releasing this information to defendants, however, the trial court certified for interlocutory appeal the question of whether plaintiff had introduced his mental condition into the case, thereby making the specified records discoverable.

The appellate court reframed the certified question and held that a plaintiff who files a negligence suit does not introduce his mental condition as an element of his claim. Consequently, the appellate court reversed the trial court's finding that plaintiff had introduced his mental condition into the case.

This court reversed the appellate court. Although we agreed that the specified records were privileged communications within the meaning of the Act and that, in the strictest sense, plaintiff had not introduced his mental condition into the proceedings, we held that "fundamental fairness commands that the privilege yield." Underpinning this ruling was our refusal to place our imprimatur on plaintiff's wielding the privilege as a sword to manipulate the legal system, coupled with the recognition that, after *in camera* inspection, the trial court restricted discovery to information which met all other requirements of section 10(a)(1) of the Act and had little to do with plaintiff's mental health treatment and more to do with plaintiff's conduct at the time of the accident. Furthermore, the information was obtainable from no other source and could, potentially, absolve defendants of any liability and bar plaintiff's recovery. We concluded that, on balance, the interests of substantial justice and fundamental fairness outweighed plaintiff's right to assert the confidentiality privilege under the unique facts of the case.

The facts in *D.C.* do not resemble the situation in the present case. First, there is nothing in this case to indicate that defendants are invoking the confidentiality privilege as a means to exploit or subvert the legal process. In fact, it may be that by protecting Steven's right to assert his privilege, the Pfiels are actually hampering their own defense to the extent that they will be unable to respond fully to allegations that they failed to take action to control Steven's behavior. Thus, contrary to plaintiff's assertions that defendants "are trying to hide behind" or "playing a game with" the privilege, there is nothing devious or underhanded about defendants' invocation of the privilege. Indeed, the confidentiality privilege is being employed precisely as intended—to shield information which our legislature has seen fit to protect. While plaintiff may be prevented from gaining complete access to information which could be beneficial to her cause, any unfairness "is that [which is] present any time a *** defendant seeks to bar potentially damaging evidence on the basis of a discovery privilege or other exclusionary rule." *People v. Gemeny*, 313 Ill. App. 3d 902, 911 (2000). As we acknowledged in *D.C.*,

> "Privileges which protect certain matters from disclosure are not designed to promote the truth-seeking process, but rather to protect some outside interest other than the ascertainment of truth at trial. 1 J. Strong, McCormick on Evidence § 72, at 269 (4th ed. 1992). Thus, privileges are an exception to the general rule that the public has a right to every person's evidence." *D.C.*, 178 Ill. 2d at 561-62.

Another major distinction between *D.C.* and the present case is the nature of the evidence held discoverable in *D.C.* and the impact that evidence had on the outcome of the case. In *D.C.*, legitimate discovery revealed information about plaintiff's mental state at the time of the accident which, if true, had the potential of completely barring plaintiff's recovery and absolve defendant of liability. In other words, the privileged information had

the inherent capacity to determine the outcome of the case.

In the case at bar, the trial court has ordered discovery when there is nothing to suggest that anything that might be revealed through the disclosure of Steven's mental health records and communications could be outcome determinative to any matter pending in the civil case brought by plaintiff.

As we noted earlier, the trial court has already ruled that Steven may not deny liability on the wrongful-death and survival claims against him. The only other claim pending against him is that he recklessly caused emotional distress to plaintiff. This claim relates to events which took place in 1995, when Steven, while free on bail, killed his brother and assaulted his sister. Plaintiff was alerted by police and she allegedly suffered worry and strain due to fear that Steven would retaliate against her. Clearly, records pertaining to Steven's mental health treatment prior to July 1993 are not pertinent to this claim.

We realize that plaintiff also seeks to hold the Pfiels liable for Steven's intentional acts against her daughter on theories of negligent supervision and negligent entrustment. To succeed on her claim of negligent supervision, plaintiff must show that: (1) the Pfiels were aware of specific instances of prior conduct sufficient to put them on notice that the act complained of (in this case, Hillary's murder) was likely to occur; and (2) that the Pfiels had the opportunity to control their minor child Steven. See Restatement (Second) of Torts § 316 (1965); *Lott v. Strang*, 312 Ill. App. 3d 521, 524 (2000). To prove negligent entrustment, plaintiff must show that the Pfiels gave Steven express or implied permission to use a dangerous instrument which they knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm to others. See Restatement

(Second) of Torts § 308 (1965); *Zedella v. Gibson*, 165 Ill. 2d 181 (1995). Thus, it does not appear likely, nor does plaintiff allege, that Steven's mental health records will reveal evidence which, by itself, has the potential to establish plaintiff's claims against the Pfiels. Consequently, unlike the situation in *D.C.*, recognition of the confidentiality privilege would not have the effect of determining the outcome on any claim raised by plaintiff in this case.

Furthermore, in the present case, confidential records and communications are not the only source of information concerning the Pfiels' knowledge. Plaintiff's complaint contains factual allegations which, if proven, would support her claim that the Pfiels knew or should have known that Steven was a danger to others. Plaintiff's arguments before this court belie the need for disclosure of privileged information.

For the same reason, we reject plaintiff's claim that by upholding the confidentiality privilege in this case her constitutional due process rights will be violated. Plaintiff has no vested right in an unfettered claim, any more than the defendant in *D.C.* had a vested right in an unfettered defense. See *D.C.*, 178 Ill. 2d at 567-68.

In sum, the fundamental fairness considerations which drove our opinion in *D.C.* are not present in this case. Absent truly extraordinary circumstances, not present here, the statutory privilege must prevail. To recognize a fundamental fairness exception in this case would eviscerate the statutory privilege.

As a final observation, we note that an important consideration in our resolution of *D.C.* was the scope of disclosure that was allowed. In *D.C.* the trial court inspected the plaintiff's medical and mental health records *in camera* and ruled that an extremely limited amount of information, which was related to plaintiff's conduct at the time of the accident and met the requirements of section 10(a)(1), should be disclosed.

In the present case, however, the trial court has ordered broad discovery. Although Steven's mental health records were to be produced for *in camera* inspection, but before ruling on the relevance and admissibility of any information contained in these records, plaintiff would have been allowed to depose defendants and question them on matters that go to the heart of the therapist-recipient relationship. Plaintiff would be able to inquire about diagnoses and treatment plans and learn about private conversations with therapists regarding mental health treatment Steven may have received at any time prior to July 1993.

Even if we believed that fundamental fairness demanded the abrogation of the confidentiality privilege in this case, which we do not, such broad discovery would be unwarranted.

## CONCLUSION

It has been universally recognized that significant public and private interests are served by preserving the confidentiality of mental health records and communications. To that end, our legislature has enacted laws which place strict controls on the disclosure of mental health records and communications.

In the case at bar, defendants have invoked the protections of the Illinois Mental Health and Developmental Disabilities Act to preserve the privacy and confidentiality of mental health records and communications. Our review of the record indicates that the discovery ordered by the trial court would reveal information which is privileged and that no exceptions, statutory or otherwise, allow for its disclosure. The unique factual and procedural circumstances found in *D.C.* are not comparable to the factual setting in the present case. Consequently, we find no legitimate reason for refusing to uphold the privilege. We hold that the trial court erred when it held defendants in contempt for refusing to

comply with discovery orders. We therefore affirm the judgment of the appellate court.

*Appellate court judgment affirmed.*

CHIEF JUSTICE HARRISON, specially concurring:

Plaintiff's attempt to invoke a "fundamental fairness" exception to the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/1 *et seq.* (West 1998)) was properly rejected by the majority. Unlike my colleagues, however, I would not base that conclusion on factual distinctions between this case and our decision in *D.C. v. S.A.*, 178 Ill. 2d 551 (1997). Instead, I would hold that *D.C.* was incorrectly decided and should be overruled.

Where records and communications are privileged from disclosure under the Act, as the records and communications here were, a court has no authority to override the statutory privilege based on its own conceptions of fairness. The terms of the statute must be enforced as enacted by the General Assembly. Contrary to the position taken by the court in *D.C.*, we may not rewrite legislation or ignore express requirements contained in this or any other statute merely because we believe that doing so might better serve the interests of justice under the particular facts before us. If the statute, as enacted, appears to operate unjustly or inappropriately in certain circumstances, that is a matter for the legislature, not this court. *D.C. v. S.A.*, 178 Ill. 2d 551, 571 (1997) (Harrison, J., dissenting, joined by Nickels, J.).